# In the United States District Court for the Southern District of Georgia Waycross Division

SHEILA SMALLWOOD,

    Plaintiff,

              v.

T&A FARMS, TIMOTHY DALE DAVIS, ALPHINE DAVIS, and STACEY DINWIDDIE,

    Defendants.

No. 5:14-CV-86

## ORDER

Before the Court in this race discrimination case is Defendants T&A Farms, Timothy Dale Davis ("Dale"), Alphine ("Alphine") Davis, and Stacey Dinwiddie's ("Dinwiddie") Motion for Summary Judgment, dkt. no. 70. The motion is fully briefed and ripe for disposition. Dkt. Nos. 81–82, 89. For the reasons below, it will be **DENIED**. Plaintiff Sheila Smallwood ("Smallwood") claims that Defendants ran a racist workplace, she was forced out after being called an "uppity nigger," and she could not come back without retracting her discrimination claims. Dkt. No. 81 at 5. Smallwood has raised genuine issues of material fact, and therefore, the jury must decide this matter.

## Factual Background[1]

### Smallwood Worked for and with Defendants

The Court views the evidence most favorably to the nonmovant, Smallwood, as it must in deciding summary judgment. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000). It ignores as immaterial any inconsistencies in her case. Tomlin v. JCS Enters., Inc., 13 F. Supp. 3d 1330, 1332 n.1 (N.D. Ga. 2014).

Smallwood worked for T&A Farms from May to November 2013. Dkt. No. 81-1 ¶¶ 1-2. T&A Farms is a family egg farm. Dkt. No. 70-1 ¶¶ 1-2, 13. Hens there lay eggs in nests, and the eggs roll onto a conveyer belt, whence they are collected. Id. ¶ 2. Two sorts of employees help with this process: walkers and belt runners. Walkers train chickens to lay their

---

[1] Two declarations that Smallwood submitted do not comply with 28 U.S.C. § 1746. Declaration of Tim O'Hara, dkt. no. 81-8, lacks a date and perjury statement. Declaration of Lawrence Revis Jr., dkt. no. 81-11, lacks the specific day that it was signed. These flaws could justify disregarding the declarations. See, e.g., Orr v. Orbis Corp. (Wisc.), No. 1:07-CV-2653, 2010 WL 3368401, at *3 (N.D. Ga. July 30, 2010), adopted, 2010 WL 3368119 (N.D. Ga. Aug. 23, 2010). However, the Court declines to do so for four reasons. Defendants did not object. See Hepp v. Paul Revere Life Ins. Co., No. 8:13-CV-2836, 2015 WL 4072101, at *2 (M.D. Fla. July 2, 2015) ("Given that . . . there is no dispute regarding the authenticity of the declarations, and no showing of prejudice to Defendants, the Court finds no reason to strike . . . ."). The declarations' content "could be 'reduced to admissible evidence at trial,'" by having the declarants testify. Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999); see also Calhoun v. McHugh, 2 F. Supp. 3d 1217, 1226 (N.D. Ala. 2014). Extrinsic evidence could confirm the declarations' dates: O'Hara's refers to "last Thursday" and "again on Saturday," dkt. no. 81-8 ¶ 5, while Revis's specifies that it was signed in October 2016. Dkt. No. 81-11 at 6. See Proch v. DeRoche, No. 3:08-CV-484, 2011 WL 6841319, at *3 n.8 (N.D. Fla. Dec. 20, 2011) ("[E]xtrinsic evidence could demonstrate the period when the declaration was signed . . . ."). Besides, the declarations are not determinative of the present motion's outcome anyway.

AO 72A
(Rev. 8/82)

eggs inside the nests. Id. Belt runners take eggs from the belts. Id. Each of T&A Farms' three chicken houses needed one belt runner, plus either its own walker or a shared one, during peak season. Id. ¶¶ 3-4; Dkt. No. 81-2 at 68:11-22. The farm also hired relief workers. Dkt. No. 70-1 ¶ 5. Employees were at-will, without written contracts. Id. ¶ 14.

Peak egg season would come six to eight weeks after chickens arrived and last for another six to eight. Id. ¶ 8. When it was over, Defendants would halve their workforce. Id.

Smallwood was hired as a belt runner, and paid $35-$40 daily. Dkt. No. 81-1 ¶ 21. Dale allegedly once told her she was "the best damn worker I got out here. . . . You do your job, and you do it well." Dkt. No. 81-2 at 91:7-9 (deposition of Sheila Smallwood). Dale is sole proprietor of T&A Farms. Dkt. No. 70-1 ¶ 15. Alphine is his wife, and Dinwiddie their daughter. Id. ¶¶ 16-17, 22.

Alphine worked at the farm two to three times weekly. Id. ¶ 24. She would assign some tasks. Dkt. No. 81-6 at 87:8-16. Employees would report issues to her in Dale's absence. Id. at 87:19-23. Dale and Alphine claim that Alphine had "no managerial or supervisory responsibility." Dkt. No. 70-1 ¶ 21; see also Dkt. No. 70-4 ¶ 7.

Dinwiddie "regularly worked" at the farm. Dkt. No. 70-1 ¶ 27. Alphine allegedly once told Smallwood, "[Dinwiddie] is

AO 72A
(Rev. 8/82)

over this farm now. . . . [W]hatever [Dinwiddie] say [sic], you do it." Dkt. No. 81-2 at 43:12-15 (deposition of Sheila Smallwood); see also Dkt. No. 81-7 at 49:16-19 (deposition of Lawrence Revis, Jr.) ("[Alphine] . . . told us '[Dinwiddie] is going to be the manager. I'm going to be out for a couple of days. . . . You all need to do what she says.'"). Smallwood considered Dinwiddie to be a "manager or supervisor." Id. at 54:2-3. Dinwiddie gave workers days off and assigned tasks. Id. at 54:25-55:18; cf. Dkt. No. 81-6 at 85:8-86:6, 105:5-7 (confirming this, but conceding deponent did not believe he had to follow her orders and did not consider her to be direct manager); Dkt. No. 81-7 at 49:22-50:8 (describing Dinwiddie as direct manager in Dale's absence). Her husband, Michael Dinwiddie ("Michael") worked at the farm too, often doing maintenance. Dkt. No. 70-1 ¶ 26.

### Smallwood Alleges that Defendants Maintained Racist Work Conditions

Smallwood alleges that T&A Farms was a hotbed of racism, in terms of work conditions, bathroom access, epithets, and ultimately, Smallwood's termination.

Smallwood asserts that Defendants required less work of white employees than of black ones. Dkt. No. 81-1 ¶ 30. She says that white employees "left their baskets of dirty eggs behind to be cleaned" by black employees. Id. ¶ 31. Further,

AO 72A
(Rev. 8/82)

she claims that black employees, but not white ones, had to carry buckets full of bad eggs to a pond and pour them in. Dkt. No. 81-2 at 61:3-13.

Defendants supposedly paid white employees more than black ones. Smallwood claims to have once found a payroll paper indicating that white employees earned $55 to $60 a day. Id. at 44:7-12; cf. Dkt. No. 81-9 ¶ 6. Her coworker also testified that he saw the paper; he said that it listed the wages of all white employees, including two who were unrelated to Dale, as $55 daily. Dkt. No. 81-7 at 25:18-27:11 (statement of Lawrence Revis, Jr.). The employee confronted Dale, who allegedly told him, "If you don't like the way I run this, you can leave." Id. at 32:4-7. Defendants say that all employees other than Michael were paid $40 daily, and that Michael only made $42.85 a day. Dkt. No. 70-1 ¶¶ 10, 30.

Smallwood says that eating lunch in Defendants' office was a right reserved to whites. Dkt. No. 81-2 at 87:13-23; see also Dkt. No. 81-6 at 62:6-63:4 (testifying that white employees ate lunch there daily, but black ones could not); Dkt. No. 81-7 at 41:24-42:3, 48:5-13 ("[W]e weren't allowed to go into the office, period, unless [Defendants] were in there, and they called you in"—but white employees ate inside). So was taking free water from, or using, a refrigerator. Id. at 88:6-90:7; see also Dkt. No. 81-7 at 47:17-19.

AO 72A
(Rev. 8/82)

Black employees could allegedly only sit on milk crates, while white ones could use chairs. Id. at 58:4-6. Smallwood claims that Defendants cut black employees' hours and pointed to financial concerns, but brought on paid white relief workers to take the shifts. Id. at 86:8-25; see also Dkt. No. 81-6 at 82:4-83:16; Dkt. No. 81-7 at 38:5-40:15.

Smallwood testified that she often complained to Dale about Dinwiddie using the words "nigger" and "coon," including on three office visits. Dkt. No. 81-9 ¶ 9. "Every time [she] complained, [Dinwiddie] would take [her] days away," and she would thus lose pay. Id. Dinwiddie allegedly told Smallwood that "if [Smallwood] had kept [her] mouth shut and not complained . . . [she] would have [had her] days." Id. ¶ 10.

**Defendants Allegedly Denied Black Employees Bathroom Access**

Smallwood presented evidence that black employees could not use the only chicken-house bathroom. Dkt. No. 81-2 at 46:2-4. It had an out-of-order sign. Dkt. No. 70-1 ¶ 33. Smallwood would occasionally sneak in, trying to avoid white employees sitting in the office, and she says that its toilet flushed just fine. Dkt. No. 81-2 at 46:14-15, 52:3-13; see also Dkt. No. 81-6 at 56:20-21; Dkt. No. 81-7 at 43:3-44:15 (deposition of Lawrence Revis, Jr.) (describing bathroom as exceedingly dirty, but functional).

AO 72A
(Rev. 8/82)

Smallwood testified that Michael once saw her heading toward the bathroom and told her she was not allowed to use it. Id. at 46:19-47:3. Dinwiddie then allegedly put a chair and fan against the door so that she would know whether anyone had been inside. Id. at 47:5-15. Dinwiddie allegedly said that the bathroom was to be reserved for Dale and Alphine, and that "Michael won't use it because he saw [Smallwood] going in." Id. at 48:12-16. Smallwood claims that Dinwiddie told her to get permission any time that she wanted to use a nearby store's bathroom. Id. at 48:20-25. When Smallwood protested to Dale, she says that he replied, "It's whatever [Dinwiddie] said. I'm not going to go over her head . . . ." Id. at 51:10-12. Smallwood alleges that Michael once denied Smallwood permission to go to the store's bathroom, and so she ended up cleaning up from menstruation in a chicken-house corner. Id. at 49:2-9, 17-25. Smallwood purports that white employees could use the chicken-house bathroom, even when it was supposedly out of order. Id. at 50:11-16; see also Dkt. No. 81-6 at 57:12-22.

Additionally, Smallwood claims that Dale told black employees not to use another farm bathroom, directing them to the woods instead. Id. at 51:13-18; see also Dkt. No. 81-6 at 55:25-56:2; Dkt. No. 81-11 ¶ 9.

Defendants deny all of this, claiming that the chicken-house bathroom was out of order for a month due to extreme dirtiness, and employees used the store bathroom during that time. Dkt. No. 70-1 ¶¶ 33–35. All employees were free to use the chicken-house bathroom thereafter. Id. ¶ 36. Defendants claim that Dale never told black employees not to use the bathroom, when it was in order. Id. ¶ 31.

**Smallwood Alleges that Defendants Used Racial Epithets**

Defendants allegedly infused racism into their language. Dale purportedly used many slurs:

> The "N" word came out maybe once every few weeks. "Yard monkey" was him referring to [Smallwood's] grandbaby by one of the other black employees. . . . "I'll slap the black off [of you]" [ ] was if we wasn't doing our work properly. . . . The "coon" word was used at least once, if not twice a week. . . .

Dkt. No. 81-2 at 40:13–41:7; see also id. at 41:10–16; Dkt. No. 81-6 at 83:13–84:10 (deposition of John Smallwood); Dkt. No. 81-8 ¶ 4 (declaration of Tim O'Hara) ("[Dale] admitted to me that he called us the 'N' word, yardmonkeys and coons."); Dkt. No. 81-10 ¶ 12 (declaration of John Smallwood) (describing Dale making black-power salute and saying, "Ain't that what y'all niggers do back in the day!"); Dkt. No. 81-11 ¶ 7 (declaration of Lawrence Revis, Jr.) (describing Dale calling black workers "coons" and "yard monkeys"); cf. Dkt.

AO 72A
(Rev. 8/82)

No. 81-7 at 32:17 (deposition of Lawrence Revis, Jr.) ("He called me 'boy'.").[2]

Smallwood recalls protesting that Dale's use of "[t]he 'nigger' word . . . was offensive. [She] went to him three or four times . . . ." Id. at 42:4-6. She testified that Dale responded that when he was young, his father "slapped [him] in his mouth" for using a black man's name, telling him, "Those are niggers. That's what you call them." Id. at 42:10-17. Dale supposedly told Smallwood, "Just take what we say and move on." Id. at 42:20-21; cf. Dkt. No. 81-7 at 34:12-14 (deposition of Lawrence Revis, Jr.) (saying when confronted about calling black men "boys," Dale "laughed it off").

After President Obama's reelection, Smallwood says that Dale asked her and her husband, John Smallwood ("John"), "Why did you all get that coon back into office?" Id. at 85:20-22.

Dale denies ever using any of these racial slurs against black employees. Dkt. No. 70-3 ¶¶ 47; see also id. ¶ 52

_____

[2] Smallwood also filed a recording, allegedly of a conversation between Dale and John Smallwood. Dkt. No. 81-12 at 2; see also Dkt. No. 81-6 at 93:6-94:25 (statement of John Smallwood) (describing conversation and asserting recording's authenticity). It is difficult to make out what is said, and Defendants did not concede its veracity. Dkt. No. 81-6 at 95:24-96:8. However, the supposed Dale does clearly ask the supposed John, "[H]ave you ever been called a coon before?" John says that he has, and Dale replies, "You probably have. I'll admit it to you, I ain't going to admit it to nobody else." Dkt. No. 81, Ex. 11 at 0:25-33.

AO 72A
(Rev. 8/82)

(claiming that he uses "boy," without racial overtones, to refer to males, including friends and family members).[3]

According to Smallwood, Dale was not the only Defendant to speak in a racist way. Alphine supposedly said that Smallwood's grandson's father "look[ed] like a yard monkey," and asked if she was "afraid that [her] grandson would come out looking like a yard monkey and be as black as [the father]." Dkt. No. 81-2 at 72:8-13. When Smallwood protested, Alphine allegedly replied, "This is my property, and I can say and do what I want to." Id. at 74:8-9. Alphine denies using any of the racial slurs alleged against employees. Dkt. No. 70-4 ¶ 27.

Smallwood testified that Alphine told her that Dinwiddie was raised to use racial slurs: "Take it or leave it. That's how it's going to be." Dkt. No. 81-2 at 43:14-23. Dinwiddie allegedly referred to black employees, but not white men, as "boys." Id. at 78:17-79:8, 103:6-11; see also Dkt. No. 81-7 at 51:23-52:3. One day, Smallwood's mixed-race adopted son came to visit the farm. Id. at 80:9-13. Dinwiddie supposedly asked, "How can you all have a mixed baby?" Id. at 80:13-16. Dinwiddie is alleged to have said that she was trying to become a foster parent, but had rejected a black child. Id. at 80:18-20. "I couldn't tell them I was racist, or I was a

---

[3] Practically identical paragraphs appear in Alphine's and Dinwiddie's declarations. Dkt. No. 70-4 ¶¶ 27, 32; Dkt. No. 70-5 ¶¶ 17, 22.

AO 72A
(Rev. 8/82)

bitch," she reportedly said, before going on: "A coon or a nigger baby would never be welcome around our table." Id. at 81:10-11, 20-21; cf. Dkt. No. 81-7 at 51:5-18 (stating Dinwiddie called black people "coon," "the 'N' word," and "boy"). When Smallwood replied that her son would be taught to see love and not skin color, Dinwiddie allegedly answered, "[I]t's not like that in our house." Id. at 81:20-25.

Then, several other black employees walked in. Smallwood says that Dinwiddie looked around and said, "You all make me feel threatened, like you all want to jump on me." Id. at 82:7-15. "Ain't that what you all black people do, you all gang up and jump on people?," she allegedly asked. Id. at 82:20-22. According to Smallwood, Dinwiddie also once compared a group of black people to a cow herd. Id. at 83:19-22. Dale had supposedly said something similar to Smallwood's son. Id. at 83:22-23; cf. Dkt. No. 81-6 at 98:15-17 (saying Dale admitted to comparing black people to "a bunch of cows trying to jump on you.").

Finally, Dinwiddie is alleged to have told black employees listening to rap that Dale "don't like you playing that nigger music out here." Id. at 84:16-18; see also Dkt. No. 81-10 ¶ 9.

Dinwiddie denies using the racial slurs alleged against black employees. Dkt. No. 70-5 ¶ 17.

AO 72A
(Rev. 8/82)

**Defendants Allegedly Terminated Smallwood after Calling Her an Epithet**

Tensions peaked one November 2013 day. Alphine ordered John to fix a water hose, throwing it at his feet. Dkt. No. 81-1 ¶ 3; Dkt. No. 81-2 at 18:19-22; Dkt. No. 81-6 at 34:25-35:2. John had already fixed Smallwood's hose, but Alphine had given it to Michael. Dkt. No. 81-2 at 18:18-19, 18:23-19:3; see also Dkt. No. 81-6 at 34:21-24. Smallwood protested John being made to fix another hose. Id. In the ensuing argument, Alphine supposedly sniped, "You think you got too much education because you're in school. You're an uppity nigger." Id. at 19:9-11; see also Dkt. No. 81-6 at 37:20-38:3. Smallwood criticized Alphine's tone. Id. at 19:12-13.

In turn, Dale, who was nearby,[4] chastised Smallwood for hers. Id. at 19:15-16; cf. Dkt. No. 81-1 ¶¶ 7-8; Dkt. No. 81-6 at 40:9-41:20. According to Smallwood, she protested Alphine's "calling [her] out of [her] name," and Alphine interjected, "This is my property, my home. I can do what I want to do." Id. at 19:17-20. Smallwood then allegedly threatened to call the Department of Labor. Id. at 19:22-23; see also Dkt. No. 81-6 at 39:11-18.

She walked back to her chicken house, but Dale supposedly told John, "Take her ass home. . . . Get her off of my

---

[4] The three references describe Dale's location differently from each other. Inconsistencies in Smallwood's evidence are irrelevant to Defendants' motion for summary judgment. See discussion supra.

AO 72A
(Rev. 8/82)

property." Id. at 20:3-8; see also Dkt. No. 81-6 at 42:5-7. Smallwood says that Dale said, "You'll be back. You're broke, you're black, and you need me." Id. at 20:14-17; see also Dkt. No. 81-6 at 42:10-12. Smallwood allegedly answered, "You don't pay me enough money to deal with the way that you all talk to me. I will not be back." Id. at 20:19-21.

Defendants recall the day differently, claiming that Smallwood was doubly upset by her daughter's pregnancy and discovering that her hose was missing. Dkt. No. 70-1 ¶¶ 43-44; but see Dkt. No. 81-9 ¶ 13 (sworn declaration of Sheila Smallwood) (denying that the pregnancy upset her). Smallwood argued with Alphine and Michael about the hose. Id. ¶ 45. Alphine did not use a racial slur, but Smallwood characterized Defendants as "rich white folks." Dkt. No. 70-4 ¶ 21; see also Dkt. No. 70-3 ¶ 38. Dale did not like Smallwood's tone, and asked John to take her home because she was out of control. Dkt. No. 70-1 ¶¶ 45, 47. Smallwood said that she would not return. Id. ¶¶ 50-51.

**Smallwood Claims that Defendants Made Smallwood Choose Between Her Job and Her Discrimination Claims, and She Filed the Present Suit**

Smallwood spoke to the Department of Labor, a fact that Dale allegedly learned. Dkt. No. 81-2 at 21:16-17, 20. Dale twice told John that he did not want her to come back yet, then supposedly conditioned her return on "sign[ing] papers

AO 72A
(Rev. 8/82)

stating that [she] lied about everything." Id. at 21:13-24. Smallwood refused, so Dale replaced her with a white worker. Id. at 21:24-22:2; see also Dkt. No. 81-10 ¶ 10.

Smallwood filed an EEOC charge on December 18, 2013. Dkt. No. 70-6 at 30. EEOC issued notice of her right to sue on August 4, 2014. Dkt. No. 1-1 at 1. Smallwood filed this lawsuit on October 28, 2014. Dkt. No. 1. She complained of violations of 42 U.S.C. § 2000e et seq. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"): (1) color and race discrimination; (2) disparate treatment; and (3) retaliation. Dkt. No. 7 ¶¶ 32-49.

A current employee claims that Dale "has paid [him] extra money and offered to buy [him] a car if [he] agree[s] to testify on [Dale's] behalf and say what [Dale] want[s] [him] to say." Dkt. No. 81-8 ¶ 5. He says that Dale "has been . . . asking the black employees to take up for [Dale] in court." Id. ¶ 6.

Dale says that Smallwood decided to make "highly inflammatory, false" allegations against him and his family after visiting the EEOC's website. Dkt. No. 70-3 ¶ 49. He believes that "Smallwood, with her strong personality, persuaded her fellow African American co-workers to join with her in a conspiracy to sue [him] and [his] family for money in a bogus discrimination case." Id. ¶ 50.

14

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The court must view the evidence most favorably to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The movant must establish that there is no genuine issue of material fact by showing that the nonmovant's case lacks supporting evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). If it does, then the nonmovant can show "that the record in fact contains [such] evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the [movant], who has thus failed to meet [its] initial burden." Anderson, 477 U.S. at 257; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex, 477 U.S. at 332 (Brennan, J., dissenting)). Or, the

15

nonmovant can present "additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.

## DISCUSSION

Smallwood's discrimination and retaliation claims survive summary judgment.[5]

## I. SMALLWOOD'S DISCRIMINATION CLAIMS SURVIVE.

Smallwood alleges discrimination and disparate treatment in violation of Title VII and Section 1981.[6] Dkt. No. 7 ¶¶

---

[5] Mostly. Smallwood surrenders her Title VII claims against Alphine and Dinwiddie, because non-employers are not liable under Title VII. Dkt. No. 81 at 7 n.3; see also Dearth v. Collins, 441 F.3d 931, 933 (11th Cir. 2006). Defendants' motion is **GRANTED** as to these claims.

[6] Defendants contend that Smallwood lacks standing under Section 1981, as she was an at-will employee without a contract. Dkt. No. 70-2 at 23-25. The Court follows every circuit court—and every Eleventh Circuit district court—to decide the question in holding that an at-will employee can assert a Section 1981 racial discrimination claim, at least as long as (like in Georgia) state law deems at-will employment contractual. See, e.g., Aquino v. Honda of Am., Inc., 158 F. App'x 667, 673 n.3 (6th Cir. 2005); Walker v. Abbott Labs., 340 F.3d 471, 472 (7th Cir. 2003); Turner v. Ark. Ins. Dep't, 297 F.3d 751, 756, 759 (8th Cir. 2002) (holding law clearly established); Lauture v. Int'l Bus. Machs. Corp., 216 F.3d 258, 263 (2d Cir. 2000); Perry v. Woodward, 199 F.3d 1126, 1133 (10th Cir. 1999); Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc., 160 F.3d 1048, 1050-52 (5th Cir. 1998); Forehand v. Fulton County, 510 F. Supp. 2d 1238, 1252 (N.D. Ga. 2007); Ultimax Transp., Inc. v. British Airways, Inc., 231 F. Supp. 2d 1329, 1339 (N.D. Ga. 2002) (Carnes, J.); Farrior v. H.J. Russell & Co., 45 F. Supp. 2d 1358, 1366 (N.D. Ga. 1999). It adopts Farrior's reasoning that "the on-going exchange of labor and pay represents [an unwritten] contract." 45 F. Supp. 2d at 1365 (citing Georgia law); see also Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018 (4th Cir. 1999); Lane v. Ogden Ent., Inc., 13 F. Supp. 2d 1261, 1272 (M.D. Ala. 1998) ("'Contract' is used in § 1981 in its basic legal meaning . . . ."). Recognizing such relationships as covered by Section 1981 is especially important given that that law exists to protect minority employees—many of whom are employed at-will. Id. at 1365-66.

As for Smallwood's supposed lack of a contract, she submitted an application, was hired, and worked for pay. Dkt. No. 81-1 ¶¶ 1-2, 21; Dkt. No. 81-3 at 2. Although "the contract was not written, was not for a specific term, and apparently was terminable at-will by either party," there was at least the sort of "informal business arrangement" that

AO 72A
(Rev. 8/82)

32-42. Both statutes use "the same standards of proof and . . . analytical framework." <u>Bryant v. Jones</u>, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).

Title VII only applies to employers with at least fifteen employees. 42 U.S.C. § 2000e(b). There is a genuine issue of fact as to whether this requirement is satisfied here. Questions of fact also remain as to the merits of Smallwood's case. The Court must therefore deny summary judgment.

### A. An Issue of Fact Remains as to the Number of T&A Farms Employees.

Defendants first argue that T&A Farms does not have fifteen employees, and so is exempt from Title VII. Dkt. No. 70-2 at 3-4. A fact issue remains. Title VII only applies to those employers who have "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). Employees are all those in ongoing employment relationships— not just those working on any given day. <u>Walters v. Metro. Educ. Enters., Inc.</u>, 519 U.S. 202, 206-08 (1997).

Defendants argue that they do not have fifteen employees. Dale testifies that he does not have more than six full-time employees "at any given time." Dkt. No. 70-3 ¶ 3; <u>see</u> <u>also</u> <u>id.</u> ¶ 8. He also avers that he usually does not hire relief

qualifies as a contract for purposes of Section 1981. <u>Ultimax Transp., Inc.</u>, 231 F. Supp. 2d at 1339. Defendants' argument is thus meritless.

AO 72A
(Rev. 8/82)

workers for "more than a few days at a time." Id. ¶ 4. And even Smallwood testified that T&A Farms had three belt runners and three walkers on any day. Dkt. No. 81-2 at 31:18-19.

However, Smallwood has evidence indicating that there may have been at least fifteen employees. She has testified that there were fifteen or sixteen employees. Id. at 35:10-20; see also Dkt. No. 81-9 ¶ 4 (naming 30 T&A Farms employees in 2013). John counted between ten and fifteen, some of them relief workers. Dkt. No. 70-7 at 33:20-34:11. A third employee testified that there would be up to fifteen, eight to thirteen of whom would be present on any given day. Dkt. No. 70-8 at 22:4-23:25. Some documentation supports these estimates: Timothy and Alphine cut checks to 25 people between late December 2012 and the start of 2014. Dkt. No. 81-14 at 7-55. Smallwood's evidence defeats summary judgment based on the number of T&A Farms employees.

## B. Issues Remain as to the Merits of Smallwood's Case.

Smallwood has also presented enough evidence of discrimination and disparate treatment[7] to prevent summary judgment. An employer can be liable for discrimination if it

---

[7] The parties do not distinguish between these two claims, and so neither will the Court. See generally Dkt. Nos. 70-2, 81, 89; Resolution Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . ." (internal citation omitted)).

AO 72A
(Rev. 8/82)

makes an employment decision that is motivated by discriminatory intent. Holland v. Gee, 677 F.3d 1047, 1055 (11th Cir. 2012). A plaintiff can establish such intent using direct, circumstantial, or statistical evidence. Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989). Smallwood survives summary judgment based on her direct evidence.

Direct evidence defeats summary judgment, "even where the movant presents conflicting evidence." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996). It is what can "prove[ ] existence of [the] fact in issue without inference or presumption." Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1558 n.13 (11th Cir. 1988). Direct evidence of discrimination is that which "reflects 'a discriminatory . . . attitude correlating to the discrimination . . . complained of by the employee.'" Van Voorhis v. Hillsborough Cty. Bd. of Cty. Comm'rs, 512 F.3d 1296, 1300 (11th Cir. 2008) (per curiam) (quoting Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999))).

This includes "statements displaying discriminatory animus . . . directed at an employee and made contemporaneously with an adverse employment action toward that employee." Lamothe v. Bal Harbour 101 Condominium Ass'n, Inc., 316 F. App'x 844, 846 (11th Cir. 2008) (per curiam)

19

(unpublished opinion). Smallwood presents direct evidence in the form of just such a statement: Alphine's purportedly calling her an "uppity nigger," which allegedly led directly to Dale both ordering Smallwood off the property and terminating her employment. Dkt. No. 81-2 at 19:9–20:21 (alleging that Alphine's words caused Smallwood to protest, leading Dale to remove her); Dkt. No. 81-6 at 37:20–42:5-7.

It does not matter that Alphine supposedly made the remark, whereas Dale was the one who ejected Smallwood. Dale was allegedly standing only a few feet away when Alphine uttered the epithet. Dkt. No. 81-2 at 19:15–16; Dkt. No. 81-1 ¶¶ 7-8; Dkt. No. 81-6 at 40:9–41:20. Alphine was not a random employee who happened to make a racist remark around the time that Dale decided to fire Smallwood. She was Dale's wife and the farm's "silent partner." Dkt. No. 70-3 ¶ 19 (sworn declaration of Timothy Dale Davis); see also Dkt. No. 81-4 at 3 (identifying farm's legal name as "Timothy and Alphine Davis Farm, LLC"). As Dale's right hand, her calling Smallwood by an epithet is thus akin to a "management memorandum saying, 'Fire Early—he is too old'"—which the Eleventh Circuit has said would be direct evidence of discrimination. Dixon v. The Hallmark Cos., 627 F.3d 849, 855 (11th Cir. 2010).[8]

---

[8] At the very least, Alphine's alleged epithet, that it was supposedly heard by Dale, its timing in relation to the termination, that Smallwood was "immediately replaced with a[ ] [white worker]," Dale's and

AO 72A
(Rev. 8/82)

Besides Alphine's general role in the farm, there is no break in Smallwood's narrative between Alphine's statement, Smallwood's reaction, and Dale's action, such that Alphine and her comments were "unrelated to the decisionmaking process." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); cf. Dixon, 627 F.3d at 854 (holding statement, "You're fired . . . You're too religious," to be direct evidence of discrimination, despite its not including the word "because"). Smallwood thus offers direct evidence that her termination was motivated by discriminatory intent.

The only way that Defendants can overcome such evidence is by showing that they would have acted the same way even had they been unbiased. McCarthney v. Griffin-Spalding Cty. Bd. of Educ., 791 F.2d 1549, 1553 (11th Cir. 1986). A reasonable jury could obviously believe that Smallwood never would have been terminated but for Defendants' racial prejudice, were it to find that Defendants ejected her for being "an uppity nigger."

---

Dinwiddie's purported slurs, and Smallwood's other evidence of differential treatment are enough *circumstantial* evidence of discriminatory intent to create a genuine issue of material fact as to pretext. See Copley v. Bax Glob., Inc., 80 F. Supp. 2d 1342, 1351 (S.D. Fla. 2000); Dkt. No. 81-2 at 21:24-22:2; Kilgore v. Trussville Dev., LLC, 646 F. App'x 765, 776 (11th Cir. 2016) (per curiam) (unpublished opinion) (reversing summary judgment for the defendants, partly because "[the manager and supervisor] made comments to [the plaintiff] about her . . . race, and these comments were relatively close in time to her termination by [the manager] . . . ."); Dkt. No. 81-10 ¶ 10. This is another reason that summary judgment must be denied.

AO 72A
(Rev. 8/82)

The question right now is not whether these alleged events happened. Nor is it whether, if they did occur, Defendants could place them in a nondiscriminatory context. It is only whether a rational juror could find that invidious discrimination based upon race took place. One could only decide otherwise by finding facts and weighing credibility. This takes this case outside the scope of the Court's responsibility, and so summary judgment as to Smallwood's discrimination claims must be **DENIED**.

## II. SMALLWOOD'S RETALIATION CLAIM SURVIVES.

The same is true of Smallwood's retaliation claim. Direct evidence that retaliatory intent drove an employment decision is enough to defeat summary judgment. Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997); Burkette v. Montgomery Cty. Bd. of Educ., No. 2:07-CV-1121, 2008 WL 5114313, at *10 (M.D. Ala. Dec. 4, 2008) ("[D]irect evidence of retaliation . . . cannot be rebutted."). Smallwood presented two pieces of direct evidence. First, she testified that her hours were reduced (and she thus lost pay) every time that she complained of Dinwiddie's racial epithets. Dkt. No. 81-9 ¶¶ 9-10. This testimony defeats summary judgment. See Cotton v. Cracker Barrel Old Country Store, 434 F.3d 1227, 1231 (11th Cir. 2006) ("A reduction in an employee's hours, which reduces the employee's take-home pay,

AO 72A
(Rev. 8/82)

qualifies as a[n] . . . employment action."); cf. Howell v. Corr. Med. Servs., 612 F. App'x 590, 591 (11th Cir. 2015) (per curiam) (unpublished opinion), reversing in relevant part Howell v. Corizon, Inc., Civ. A. No. 12-0272, 2013 WL 6068346, at *8 (S.D. Ala. Nov. 18, 2013) (reversing district court's holding that plaintiff's complaints about "two comments with a mild racial flavor, plus four brief incidents of yelling over work matters," plus a minor physical altercation, were unprotected from retaliation).

Smallwood also claims that Dale told her that she could not come back to work unless she disowned her discrimination claims as lies, and she was replaced when she would not.[9] Dkt. No. 81-2 at 21:21-22:2; Dkt. No. 81-6 at 43:12-16. This evidence likewise defeats summary judgment. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 73 (2006) (holding defendant could be liable for suspending employee without pay because "[a] reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former.").

---

[9] Smallwood first went to the Department of Labor—which is not the EEOC. It is thus questionable whether she was engaging in statutorily protected expression. However, she testified that before Dale threatened her, she "contacted the right person"—presumably, the EEOC. Dkt. No. 81-2 at 21:19-20. Given that Defendants have not put any weight on this ambiguity, and Smallwood's EEOC charge pointed to EEOC activity as the target of Dale's retaliation, dkt. no. 81-2 at 30 ("I was terminated after . . . reporting that I would report to the EEOC."), the Court finds that Smallwood was engaged in protected activity when Dale supposedly threatened her.

AO 72A
(Rev. 8/82)

At trial, Defendants will be able to contest Smallwood's evidence, and to present evidence of permissive motives for their actions. But their case turns on credibility, not undisputed facts. Therefore, summary judgment on Smallwood's retaliation claim must be **DENIED**.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment, dkt. no. 70, is **DENIED**. It is, however, **GRANTED** as to Smallwood's **Title VII** claims against Alphine and Dinwiddie.

**SO ORDERED**, this 13th day of January, 2017.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)